**IN THE UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | **CASE NO. 26-30311-CGB** |
| **CATHOLIC DIOCESE OF EL PASO,** | § | |
| | § | **CHAPTER 11** |
| **DEBTOR[1]** | § | |

**DIOCESE'S *EMERGENCY* MOTION FOR INTERIM AND FINAL ORDERS:
(A) AUTHORIZING THE DIOCESE TO CONTINUE ITS PRE-PETITION INSURANCE
PROGRAM AND SATISFY OBLIGATIONS DUE THEREUNDER;
(B) AUTHORIZING THE DIOCESE TO RENEW, MODIFY, OR PURCHASE
INSURANCE COVERAGE; AND (C) SCHEDULING A FINAL HEARING**

TO THE HONORABLE CHRISTOPHER G. BRADLEY,
UNITED STATES BANKRUPTCY JUDGE:

The Catholic Diocese of El Paso (the "**Diocese**"), as debtor-in-possession, through the undersigned counsel files this *Diocese's Emergency Motion for Interim and Final Orders: (A) Authorizing the Diocese to Continue its Pre-Petition Insurance Program and Satisfy Obligations Due Thereunder; (B) Authorizing the Diocese to Renew, Modify, or Purchase Insurance Coverage; and (C) Scheduling a Final Hearing* (the "**Insurance Motion**" or "**Motion**") pursuant to sections 105(a), 363(b), and 363(c) of Title 11 of the United States Code (the "**Bankruptcy Code**"). The Diocese seeks entry of an interim order substantially in the form attached hereto as Exhibit A (the "**Interim Order**"), and, after a final hearing, the entry of an order on a final basis in substantially the form attached hereto as Exhibit B (the "**Final Order**"). In support of this Motion, the Diocese relies on the *Declaration of Bishop Mark J. Seitz Regarding the Diocese's History, Charitable Mission, and Purpose in Seeking Chapter 11 Relief* (the "**Seitz Declaration**") and the *Declaration of Gregory J. Watters in Support of First Day Motions* (the "**Watters**

---

[1] The Diocese's address is 499 St. Matthews Street El Paso, TX 79907.  The last four digits of the Diocese's federal tax identification number are 0751.

**Declaration**," together with the Seitz Declaration, the "**First Day Declarations**"), which are incorporated by reference, and show as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105(a), 363(b) and 363(c) of the Bankruptcy Code and Federal Rules of Bankruptcy 6003 and 6004.

### Background

4.      On March 6, 2026 (the "**Petition Date**"), the Diocese filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Diocese continues to operate its business and manage its property as debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed, and no committees have been appointed or designated in this Chapter 11 case.

5.      With the filing of the petition, the Diocese filed the First Day Declarations. Please refer to the First Day Declarations for a summary of the Diocese in the above-referenced Chapter 11 case, including an overview of the Diocese's history, mission, ministries, financial position, the circumstances giving rise to the commencement of the Chapter 11 case, and an overview of the relief requested in the first day pleadings.

6.      Given its financial challenges and the need to reorganize, the Diocese filed this Chapter 11 case to preserve its ability to continue its religious and charitable mission while addressing its obligations to creditors in an orderly manner.

7.      To enable the Diocese to maintain its operations during this Chapter 11 case and minimize disruption to the communities it serves, the Diocese has filed various "first day" motions

HB: 4938-1347-2395.7

seeking relief necessary for an orderly transition into bankruptcy. This Motion seeks to ensure the uninterrupted provision of essential insurance services, without which the Diocese cannot function.

8.     Any interruption in the Insurance Program (as defined below) would expose the Diocese, its affiliated institutions, and the communities they serve to immediate and potentially catastrophic harm. Moreover, maintaining appropriate insurance coverage is mandated by section 1112(b)(4)(C) of the Bankruptcy Code, which provides that failure to maintain appropriate insurance constitutes "cause" for conversion or dismissal of a chapter 11 case. The continuation of the Diocese's insurance program is therefore both a legal requirement and a practical necessity for the success of this reorganization.

## The Insurance Program

**A.     Overview of Insurance Program Structure.**

9.     The Diocese maintains a comprehensive insurance program (the "**Insurance Program**") that provides essential coverage for both its own operations and numerous affiliated and separately-incorporated Catholic institutions ("**Affiliated Entities**") throughout its 26,686 square mile territory. This centralized approach achieves significant economies of scale; individual parishes and schools receive group rates that would be unavailable if they purchased coverage independently.

10.     The Diocese procures all insurance policies for the Insurance Program through the following brokers (collectively, the "**Brokers**"):

a.   **Texas Mutual Insurance Company:** Workers' compensation coverage

b.   **Catholic Mutual Group:** Property and liability

c.   **Chubb:** Media liability coverage

d.   **Church Mutual Insurance Company**: Automobile coverage

B.     **Insurance Coverage Categories.**

11.     The Insurance Program consists of four primary categories of insurance—workers' compensation, automobile, property & liability, and media liability—each serving distinct but critical functions in protecting the Diocese's and Affiliated Entities operations and the communities they serve. The following sections detail each category's structure, costs, and payment obligations.

### *Workers' Compensation*

12.     The Diocese and its Affiliated Entities together employ hundreds of full and part-time employees who serve the Catholic faithful throughout West Texas. The workforce is essential to maintaining religious, educational, and charitable services across the Diocese of El Paso. The Diocese employs 47 Laypersons (31 full time and 16 part-time) and 4 Diocesan clergy (including 2 bishops). Workers' compensation insurance allows the Diocese to limit liability against employee lawsuits, compensate employees for injuries, and manage costs for on-the-job injuries for these employees, making this insurance both legally prudent and a moral obligation to protect those who serve the Church.

13.     The workers' compensation program operates through one layer of coverage. The policy provides coverage for the vast majority of routine workplace injuries.

**Workers' Compensation Financial Summary**

| | |
|---|---|
| **Annual Premium** | $138,727 |
| **Diocese Portion (Centralized Activities)** | $6,076.57 |
| **Next Payment** | April 2026 |
| **Reimbursement from Affiliated Entities** | $132,650.43 |

### *Automobile Insurance*

14.     The Diocese's automobile insurance needs differ substantially from typical commercial operations, reflecting the unique transportation requirements of religious and

charitable institutions. Through its broker, Catholic Mutual Group, the Diocese maintains comprehensive automobile coverage through Church Mutual Insurance Company that protects not only its own limited vehicle needs but more critically, the extensive transportation services provided by the Affiliated Entities.

### Automobile Insurance Financial Summary

| | |
|---|---|
| **Annual Premium** | $78,097 |
| **Diocese Portion** | $15,000 |
| **Reimbursement from Affiliated Entities** | $63,097 |

### *Media Liability Insurance*

15.    The Diocese maintains specialized media liability coverage through Chubb (Federal Insurance Company) with a $1,000,000 aggregate limit to protect against risks arising from its communications and online presence. This coverage protects the Diocese from claims of defamation, libel, slander, invasion of privacy, and copyright infringement related to all publications produced or disseminated by the Diocese, including through its website (www.elpasodiocese.org).  In fulfilling its evangelical mission to communicate matters of faith and pastoral care to thousands of faithful across West Texas, this protection is essential to enable the Diocese to continue its communications ministry without fear that a single media-related claim could jeopardize its broader charitable mission.

### Media Liability Financial Summary

| | |
|---|---|
| **Annual Premium** | $3,396 |
| **Diocese Portion** | $3,396 |
| **Reimbursement from Affiliated Entities** | 0 |
| **Policy Period** | January 31, 2026 – January 31, 2027 |

### *Property and Liability Insurance*

16.    The property and liability insurance program represents the broadest and most complex component of the Diocese's Insurance Program, protecting historic and newer churches, schools, administrative buildings, and residential facilities, and providing crucial liability coverage for the myriad activities conducted by the Diocese and the Affiliated Entities. Through Catholic Mutual Group, the Diocese has assembled a comprehensive property and liability program.

17.    This property and liability insurance reflects careful risk management decisions balancing coverage needs with available resources and includes appropriate deductibles and self-insured retention provisions ("SIRs") that help manage premium costs while ensuring catastrophic protection. Specifically, the Diocese's current property and liability insurance includes the following deductibles and SIRs:

**Property Insurance Deductibles:**

    a.   All Other Perils: $50,000 per occurrence per location with aggregate of $250,000

    b.   Flood: $50,000 per occurrence per location with aggregate of $250,000

    c.   Earthquake: $50,000 per occurrence

    d.   Windstorm/Hail: $50,000 per occurrence per location with aggregate of $250,000

**Liability Insurance SIRs:**

    a.   $50,000 per occurrence/claim for most liability coverages

    b.   $250,000 annual aggregate for all liability coverages combined

HB: 4938-1347-2395.7

**<u>Property & Liability Insurance Financial Summary</u>**

| | |
|---|---|
| **Total Annual Premium** | $1,262,141 |
| **Diocese Portion (Centralized Activities)** | $1,502 |
| **Affiliated Entities Portion (Direct Billed)** | $1,260,639 |
| **Primary Carrier** | The Catholic Mutual Relief Society of America |
| **Policy Period** | July 1, 2025 – July 1, 2026 |

### *<u>Brokerage Services</u>*

18.     The Brokers serve as more than mere insurance intermediaries; the Brokers function as an essential partner in the Diocese's risk management efforts. The complexity of insuring religious institutions—with their unique combination of worship spaces, schools, residential facilities, and charitable operations—requires specialized expertise that few brokers possess. The Brokers' deep understanding of the Catholic Church's structure, operations, and mission enables them to negotiate appropriate coverage terms that might otherwise be overlooked or excluded.

19.     The Brokers' services extend well beyond initial policy placement. Throughout the policy period, the Brokers provide critical support including:

      a.  negotiating coverage enhancements mid-term as needs evolve;

      b.  providing risk management guidance to reduce losses;

      c.  coordinating certificates of insurance for vendors and contractors working with the Diocese's entities; and

      d.  managing the complex billing arrangements necessitated by the separate incorporation of parishes and schools.

20.     The transition to direct billing of Affiliated Entities represents a significant administrative improvement being implemented by the Brokers. This change reduces the

HB: 4938-1347-2395.7

Diocese's administrative burden while maintaining the cost advantages of group purchasing. The Brokers manage this complex billing arrangement, ensuring each of the participating Affiliated Entities receives accurate invoices while maintaining the master policies under the Diocese's name.

21.     Brokerage fees, which are included within the premium payments, represent a modest percentage of total premiums but provide outsized value. The Diocese's internal staff lacks the specialized insurance expertise necessary to navigate the increasingly complex insurance marketplace. Without the Brokers' services, the Diocese would likely pay substantially higher premiums for inferior coverage and require a full time employee to manage the insurance.

**C.      Payment Structure and Financial Impact.**

22.     The Diocese's insurance payment obligations reflect both immediate needs and longer-term commitments. The following table summarizes the complete financial picture:

| Coverage Component | Total Annual Cost | Diocese Pays | Reimbursed from Affiliated Entities | Net Diocese Cost |
|---|---|---|---|---|
| Workers' Comp (LCWCP+Excess) | $138,727.00 | $6,076.57 | $132,650.43 | $6,076.57 |
| Automobile Insurance | $78,097.00 | $15,000.00 | $63,097.00 | $15,000.00 |
| Property & Liability | $1,262,141.00 | $1,502.00 | $1,260,639.00 | $1,502.00 |
| Media Liability | $3,396.00 | $3,396.00 | $0.00 | $3,396.00 |
| **TOTAL** | $1,482,361.00 | $25,974.57 | $1,456,386.43 | $25,974.57 |

In summary, the Diocese's total annual insurance expenditure across all categories is approximately $1.5 million, with a net cost to the Diocese of approximately $26,000 after Affiliated Entities reimbursements.

HB: 4938-1347-2395.7

23.     The table below reflects the amounts the Diocese has already paid for its property, liability, and automobile insurance coverages for policy year 2025-2026:

| Amount Paid | Total Amount Billed | Total Net Due |
|---|---|---|
| $858,458.00 | $1,262,141.00 | $403,683.00 |

To the best of its knowledge and belief, the Diocese will satisfy its property, liability, and automobile insurance premium obligations for policy year 2025-2026.

24.     The Diocese's only critical premium-like payment obligations through March 6, 2026 are the payments due to Texas Mutual Insurance Company, which are billed monthly and paid by the Diocese in monthly installments of $10,782.44. Because the next monthly installment is scheduled for payment at the beginning of April, interim relief is essential to avoid coverage lapses.

25.     The Diocese seeks comprehensive authority not merely to make these scheduled payments, but also to address the dynamic nature of insurance needs during the Chapter 11 process. This authority includes the ability to pay all premiums as they come due, maintain the Broker relationships and pay associated fees, adjust coverage limits or terms if circumstances change, add or delete locations as the Diocese operations evolve, purchase additional coverage if new risks emerge, and renew policies upon expiration if the case remains pending.

26.     The requested relief reflects the reality that insurance is not a static product but requires ongoing management and adjustment. For example, if any of the Affiliated Entities sells property during the case, coverage must be adjusted accordingly. Similarly, if new ministries are established or existing ones expand, appropriate coverage must be obtained. The Brokers' continued involvement ensures these adjustments occur properly while maintaining the overall program's integrity.

HB: 4938-1347-2395.7

27.     Many of the insurance policies contain standard deductible provisions or SIRs which obligate the Diocese to bear a specified portion of a covered loss or defense cost before the insurer's obligations are triggered. The Diocese anticipates incurring, in the ordinary course of its ongoing business activities, deductibles and SIRs in connection with claims arising under insurance policies that were in effect at any time during the three-year period immediately preceding the Petition Date (the "**Qualifying Policies**"). These deductibles and SIRs could range from $50,000.00 per occurrence to $250,000.00 in the aggregate.

28.     The prompt payment of these deductibles and SIRs is not merely a settlement of old debt; rather, it is essential for enabling the swift processing and resolution of claims that directly impact current and continued operations. For example, without prompt payment of a property damage deductible, the insurer may delay or deny funding for emergency repairs, forcing the Diocese to close affected facilities and suspend its programs. Without the ability to promptly satisfy these retentions, insurers may be unable or unwilling to defend or indemnify for claims, which would significantly disrupt the Diocese's ministries, divert its administration from this restructuring process, and expose the estate to potentially far greater liabilities. This authority is requested to facilitate the efficient management of ongoing claims and to allow the estate to derive the full benefit of the Diocese's current Insurance Program.

29.     For the avoidance of doubt, in addition to its direct payment obligations, the Diocese may, in the exercise of its canonical authority and pastoral responsibilities, determine it necessary to pay insurance premiums or related obligations on behalf of struggling Affiliated Entities to ensure continuity of the Insurance Program and the uninterrupted provision of religious and charitable services throughout its territory. The authority requested herein includes the ability to make such payments.

HB: 4938-1347-2395.7

## Relief Requested

30.     By this Motion, the Diocese seeks entry of the Interim Order:

a.  granting the Diocese authority to pay its obligations under its pre-petition Insurance Program;

b.  granting the Diocese authority to renew, modify, or purchase insurance coverage in the ordinary course of business;

c.  granting the Diocese authority to pay deductibles and SIRs incurred in the ordinary course of business for claims arising under insurance policies that were in effect at any time during the three-year period immediately preceding the Petition Date;

d.  authorizing the Diocese's financial institutions ("**Banks**") to process, honor, and pay all checks or electronic fund transfers drawn on the Diocese's accounts to pay any pre-petition obligations described herein, or for the Diocese to reissue approved payments that have been dishonored post-petition; and

e.  setting a final hearing (the "**Final Hearing**").

## Bases for Relief

**A.      The Continuation of the Insurance Program Is Required by the Bankruptcy Code and U.S. Trustee Operating Guidelines.**

31.     The continuation of the Insurance Program is required by Section 1112(b)(4)(C) of the Bankruptcy Code, which provides that failure to maintain appropriate insurance that poses a risk to the estate or to the public constitutes "cause" for conversion or dismissal. This mandatory requirement, combined with the Diocese's ordinary course authority under Sections 363(c), 1107, and 1108, provides ample authority for the relief requested without need for priority determination.

32.     A debtor in possession may enter into transactions in the ordinary course of business – including the use, sale, or lease of property – without notice or a hearing. 11 U.S.C. § 363(c)(l). Alternatively, section 363(b) provides that the debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(l). Under section 363(b), courts generally require only that the debtor "show that a sound

11

business purpose justifies" the proposed use of property. *See In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (requiring a "good business reason" for use under section 363(b) of the Bankruptcy Code). Moreover, if a debtor articulates a reasonable basis for business decisions, such that they are not made arbitrarily or capriciously, then "courts will generally not entertain objections to the debtor's conduct." *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task."). The Diocese's decision to continue its comprehensive and cost-effective Insurance Program, including its various components and the use of the Broker, represents a sound exercise of its business judgment, which courts routinely defer to under Section 363(b).

33.     The prompt payment of deductibles and SIRs for the Qualifying Policies is an integral and unavoidable component of maintaining essential insurance coverage, which is a prerequisite for the Diocese's continued operations. Insurance policies are not passive safeguards; they are active contracts that require the insured's financial participation through the satisfaction of deductibles and SIRs as claims arise. This participation is contractually mandated, serving as a prerequisite to accessing the benefits and protections of the insurance coverage itself. Critically, the Diocese's ability to promptly satisfy these obligations in the ordinary course is essential to maintaining the "appropriate insurance" contemplated by Section 1112(b)(4)(C) of the Bankruptcy Code, a statutory requirement whose failure can constitute "cause" for conversion or dismissal of a Chapter 11 case.

HB: 4938-1347-2395.7

**B.      Payment of Prepetition Insurance Obligations Is Warranted Under the Doctrine of Necessity.**

34.      Section 105(a) of the Bankruptcy Code provides that the Court "may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." The "doctrine of necessity" functions in chapter 11 cases as a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of prepetition claims not explicitly authorized by the Bankruptcy Code. *See In re Lehigh & New Eng. Ry. Co.*, 657 F.2d 570, 581 (3d Cir. 1981) (holding that a court may authorize payment of prepetition claims essential to continued operation); *see also In re Just for Feet, Inc.*, 242 B.R. 821, 824-25 (D. Del. 1999) (holding that section 105(a) "provides a statutory basis for the payment of prepetition claims"); *In re Columbia Gas Sys., Inc.*, 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (explaining that the doctrine of necessity empowers a court to approve payment of prepetition claims before a plan is confirmed).

35.      Federal courts consistently have permitted post-petition payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors. *See, e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973, 985 (2017) (noting that courts are authorized to approve orders allowing payment of prepetition claims which is necessary for the debtors to have a successful reorganization); *see also Ionosphere Clubs*, 98 B.R. 174, 177 (Bankr. S.D.N.Y. 1989).

36.      Consistent with the foregoing, this Court has routinely granted the relief requested herein under sections 105(a) and 363(b) of the Bankruptcy Code. *See e.g.*, *In re NGN8 Group Inc.*, No. 26-10193, Order, Doc. 13 (Feb 3, 2026); *Premier Datacom, Inc.*, No. 25-10097, Order, Doc. 43 (January 31, 2025); *In re Norris Training Systems LLC*, No. 24-10807, Order, Doc. 74 (July 29, 2024); *In re Eagle Valley Energy Partners LLC*, No. 23-10034, Doc. 25 (February 1, 2023);

13

*In re Activa Resources LLC*, No. 22-50117, Order, Doc. 30 (February 9, 2022); *In re All American Oil & Gas Incorporated, Kern River Holdings Inc., et al*, No. 18-52693, Order, Doc. 146 (December 13, 2018).

37.     The Insurance Program is essential to preserving the Diocese's operations and estate value. The inclusion of separately incorporated parishes, schools, and charitable organizations in the Insurance Program provides significant benefits through economies of scale that reduce overall insurance costs. Without the centralized Insurance Program, individual churches, schools, and charitable organizations would face substantially higher premiums or might be unable to obtain adequate coverage at all. Any interruption in the Insurance Program would expose not only the Diocese but also the numerous institutions and thousands of Texas residents who depend on their services to immediate and potentially catastrophic harm. Payment of Insurance Program obligations is therefore warranted under section 363(b) and the doctrine of necessity, as any interruption would materially impair the Diocese's ability to operate and fulfill its religious and charitable mission.

38.     The payment of deductibles and SIRs under the Qualifying Policies is particularly warranted under the doctrine of necessity because these obligations directly impact the Diocese's ability to access insurance coverage for ongoing operations, such as accidents or injuries occurring during charitable activities or property maintenance. Without this payment, insurers may refuse to process claims, decline to provide legal defense, or withhold indemnification, leaving the Diocese exposed to direct liability. This would force the Diocese to divert scarce resources to self-fund legal defense and settlements, severely disrupting its charitable and religious operations.

HB: 4938-1347-2395.7

C.    **This Court Should Authorize the Processing of Checks and Electronic Fund Transfers.**

39.    The Diocese has sufficient funds to pay the amounts described in this Motion and can readily identify checks or wire transfers relating to the Insurance Program, including premium payments, broker fees, and deductibles/SIRs for the Qualifying Policies.

40.    The Diocese therefore requests that the Court authorize: (a) the Banks to honor all checks and transfers for Insurance Program obligations regardless of issue date; (b) the Banks to rely on the Diocese's representations regarding which payments to honor; and (c) the Diocese to issue replacement checks or transfers if any are dishonored.

D.    **Interim Relief Is Warranted to Avoid the Potential for Immediate and Irreparable Harm.**

41.    To avoid immediate and irreparable harm, a Court may grant the relief requested within 21 days after the Petition Date. *See* Fed. R. Bankr. Proc. 6003. The "immediate and irreparable harm" standard is satisfied where, as here, going forward without the relief requested could impair a debtor's ability to operate.

42.    Any interruption or lapse in the critical insurance coverages would expose the Diocese's operations, employees, and those it serves to immediate, uninsured risks, constituting precisely the "immediate and irreparable harm" contemplated by Rule 6003. For example, without the insurance coverage discussed in this Motion, the Diocese would be unable to operate vehicles for ministry activities, would face potential closure of facilities due to uninsured property risks, and would be exposed to direct liability for workplace injuries without workers' compensation protection. Moreover, failure to maintain appropriate insurance that poses a risk to the estate or to the public constitutes mandatory "cause" for conversion or dismissal under section 1112(b)(4)(C). Accordingly, the Diocese submits that it has satisfied the "immediate and irreparable harm"

HB: 4938-1347-2395.7

standard of Bankruptcy Rule 6003 to support granting the relief requested, and requests the Court enter an Order substantially in the form attached as <u>Exhibit A</u>.

**E.    The Essential Nature of the Relief Requested Justifies the Waiver of Stay and Notice Requirements.**

43.    Given the essential nature of the relief requested, the Diocese respectfully requests a waiver of (a) the notice requirements of Bankruptcy Rule 6004(a), and (b) the 14-day stay under Bankruptcy Rules 6004(h), 7062, 9014, or otherwise. The critical nature of maintaining uninterrupted insurance coverage and the potential for immediate harm support this request.

<u>**Notice**</u>

44.    The Diocese will provide notice of this Insurance Motion to: (i) the Diocese's insurers identified on the Diocese's Schedules; (ii) the Office of the United States for Trustee for Region 7; (iii) the attorneys for the Committee once the committee has been appointed, and until then, (a) the Plaintiffs in abuse lawsuits against the Diocese through their counsel and (b) the Diocese's twenty (20) largest unsecured trade creditors; (iv) the Diocese's secured creditor, WestStar Bank, through its counsel (v) those persons who have formally appeared by filing a Notice of Appearance, a Request for Notice, or a similar document and requested notice in this case under Bankruptcy Rule 2002; (vi) the Texas Attorney General's Office; (vii) the Diocese's insurance providers; (viii) the ad hoc group of abuse survivors through its counsel, Drew J. Glasnovich; and (ix) to the extent applicable, known counsel to the foregoing. A copy of this Motion and any orders approving it will also be made available on the Diocese's Case Information Website located at https://cases.stretto.com/dioceseofelpaso. The Diocese submits that, in light of the nature of the relief requested, no other or further notice need be given.

## **Reservation of Rights**

45.     Nothing contained in this Insurance Motion is intended or should be construed as: (a) an admission as to the validity of any particular claim against Diocese; (b) a waiver of the Diocese's rights to dispute any particular claim on any grounds; (c) a promise to pay any particular claim; (d) the assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (e) a waiver or limitation of the Diocese's rights under the Bankruptcy Code or any other applicable law, including, without limitation, the 1983 Code of Canon Law for the Church, the First Amendment of the United States Constitution, the Constitution of the State of Texas, the Religious Freedom Restoration Act, the church autonomy doctrine, any applicable charitable trust law, or the right to object to disclosure of information.

## **No Prior Request**

46.     No prior motion for the relief requested has been made to this or any other court.

**WHEREFORE**, the Diocese respectfully requests that the Court (a) enter an Interim Order substantially in the form attached as Exhibit A granting the relief requested herein, including scheduling the Final Hearing; (b) enter a Final Order substantially in the form attached as Exhibit B; and (c) grant such other relief as the Court deems appropriate under the circumstances.

HB: 4938-1347-2395.7

Dated: March 6, 2026                 Respectfully submitted,

                                     **HUSCH BLACKWELL LLP**

                                     */s/ Lynn Hamilton Butler*
                                     Lynn Hamilton Butler (SBN 03527350)
                                     Email: lynn.butler@huschblackwell.com
                                     Tara T. LeDay (SBN 24106701)
                                     Email: tara.leday@huschblackwell.com
                                     Jennifer Pollan (SBN 24150828)
                                     Email: jennifer.pollan@huschblackwell.com
                                     111 Congress Avenue, Suite 1400
                                     Austin, Texas 78701
                                     Main No. (512) 472-5456
                                     Fax No.  (512) 479-1101

                                     -and-

                                     **HUSCH BLACKWELL LLP**
                                     Francis H. LoCoco, Esq. (TBN 24122830)
                                     Email: frank.lococo@huschblackwell.com
                                     511 North Broadway, Suite 1100
                                     Milwaukee, WI 53202
                                     Telephone      (414) 273-2100
                                     Facsimile      (414) 223-5000

                                     **PROPOSED ATTORNEYS FOR THE DEBTOR
                                     AND DEBTOR IN POSSESSION, CATHOLIC
                                     DIOCESE OF EL PASO**

HB: 4938-1347-2395.7

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 6, 2026, a true and correct copy of the forgoing document, together with all exhibits and attachments hereto, was filed with the Court and served via Certified Mail/Return Receipt Requested and United States First-Class Mail to the insurance providers listed below and to the parties on the attached service via the method indicated.

Chubb Group of Insurance Companies
c/o Jayne Downey
P O Box 2002
Simsbury CT 06070-7683

Catholic Mutual Group
c/o Jake Livingston
10843 Old Mill Road
Omaha NE 68154

Texas Mutual Insurance Company
c/o Justine Crick
P O Box 12058
Austin TX 78711-2058

Church Mutual Insurance Company
P O Box 357
Merrill WI 55452-0357

*/s/ Lynn Hamilton Butler*
Lynn Hamilton Butler

HB: 4938-1347-2395.7

**Secured Creditor**
WestStar Bank
c/o James Brewer
KEMP SMITH LAW
221 N. Kansas, Suite 1700
El Paso TX 79901
*Via Email:  jim.brewer@kempsmith.com*

**Ad Hoc Committee**
c/o Drew J. Glasnovich
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis MN 55402
*Via Email:  drew.glasnovich@stinson.com*

**U.S. Trustee**
Aubrey Thomas
Assistant United States Trustee
UNITED STATES TRUSTEE-REGION 7
615 E. Houston Street, Suite 533
San Antonio TX 78205
*Via Fax:  210-472-4649*

**Texas Attorney General**
Texas Office of the Attorney General
Bankruptcy & Collections Division
P.O. Box 12548
Austin TX 78711-2548
*Via U.S. Mail*

**Top 20 Unsecured Creditors**

**GALLAGHER BASSETT SERVICES, INC.**
Attn: Steve Puteki
15763 Collections Center Drive
Chicago IL 60693
*Via Email:  GB-AR-Mail@gbtpa.com*

**Gilberto Morales**
c/o David M. Driscoll
AINSA HUTSON LLP
5809 Acacia Circle
El Paso TX 79912-4859
*Via Email: info@ahhclawyers.com*

**Isaac Melendrez**
c/o Margie A. Rutledge
Carey Bhalla
Carolyn M. Nichols
Roshanna K. Toya
ROTHSTEIN DONATELLI LLP
500 4th Street, N.W., Suite 400
Albuquerque NM 87102
*Via Emal:  mrutledge@rothsteinlaw.com*
*Via Email:  cbhalla@rothsteinlaw.com*
*Via Email:  cnichols@rothsteinlaw.com*
*Via Email:  rtoya@rothsteinlaw.com*

**John Doe "203"; Jane Doe "204";**
**John Doe "206"; Jane Doe 208;**
**John Doe 209; John Doe 211;**
**John Doe 212; Jane Doe 214**
c/o Levi A. Monagle
Shayne C. Huffman
Jason T. Wallace
HUFFMAN WALLACE & MONAGLE LLC
122 Wellesley Dr. SE
Albuquerque NM 87106
*Via Email: office@hmhw.law*

-and-

c/o Ben Davis
Zackeree Kelin
Ellen Geske
DAVIS KELIN LAW FIRM, LLC
127 Bryn Mawr Drive, SE
Albuquerque NM 87106
*Via Email: bdavis@daviskelin.com*
*Via Email: zkelin@daviskelin.com*
*Via Email: egeske@daviskelin.com*

**Jane Doe 1; Jane Doe 2; Jane Doe 3;**
**Jane Doe 4; Jane Doe 5**
c/o Taylor E. Smith
Carolyn M. "Cammie" Nichols
ROTHSTEIN DONATELLI LLP
500 4th Street, N.W., Suite 400
Albuquerque NM 87102
*Via Email: tsmith@rothsteinlaw.com*
*Via Email: cmnichols@rothsteinlaw.com*

HB: 4938-1347-2395.7

*-and-*

c/o Sam Fadduol
Christopher P. Winters
FADDUOL, CLUFF, HARDY &
CONAWAY, P.C.
3301 San Mateo Boulevard NE
Albuquerque NM 87107
*Via Email: sfadduol@fchclaw.com*
*Via Email: cwinters@fchclaw.com*

-and-

c/o Paul Linnenburger
Lane + Linnenburger + Lane LLP
P O Box 6622
Albuquerque NM 87197
*Via Email: paul@attorneyslane.com*

**John Doe 1; John Doe 2;**
**Leigh Messerer as Personal**
**Representative of John Doe 3**
c/o Taylor E. Smith
Carolyn M. "Cammie" Nichols
Carey Bhalla
Roshanna K. Toya
ROTHSTEIN DONATELLI LLP
500 4th Street, N.W., Suite 400
Albuquerque NM 87102
*Via Email: tsmith@rothsteinlaw.com*
*Via Email: cmnichols@rothsteinlaw.com*
*Via Email:  cbhalla@rothsteinlaw.com*
*Via Email:  rtoya@rothsteinlaw.com*

**John Doe 210;**
c/o Levi A. Monagle
Shayne C. Huffman
Jason T. Wallace
HUFFMAN WALLACE & MONAGLE LLC
122 Wellesley Dr. SE
Albuquerque NM 87106
*Via Email: office@hmhw.law*

HB: 4938-1347-2395.7