IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § § | |
| | § | CASE NO. 26-30311-CGB |
| CATHOLIC DIOCESE OF EL PASO, | § § | |
| | § | CHAPTER 11 |
| DEBTOR[1] | § | |

**DIOCESE'S _EMERGENCY_ MOTION FOR INTERIM AND FINAL ORDERS: (A) AUTHORIZING CONTINUED USE OF EXISTING CASH MANAGEMENT SYSTEM; (B) AUTHORIZING MAINTENANCE OF EXISTING BANK ACCOUNTS, BUSINESS FORMS, AND SEGREGATED RESTRICTED FUND ACCOUNTS; (C) WAIVING CERTAIN DEPOSIT AND INVESTMENT REQUIREMENTS AND (D) GRANTING RELATED RELIEF**

TO THE HONORABLE CHRISTOPHER G. BRADLEY,
UNITED STATES BANKRUPTCY JUDGE:

The Catholic Diocese of El Paso (the "**Diocese**"), through the undersigned counsel, files its *Emergency Motion for Interim and Final Orders: (A) Authorizing Continued Use of Existing Cash Management System; (B) Authorizing Maintenance of Existing Bank Accounts, Business Forms, and Segregated Restricted Fund Accounts; (C) Waiving Certain Deposit and Investment Requirements; and (D) Granting Related Relief* (the "**Cash Management Motion**" or "**Motion**") and would respectfully show the following:

## INTRODUCTION

The Diocese maintains a comprehensive Cash Management System essential for its daily religious, charitable, and educational operations. This system includes numerous bank accounts for general operations, payroll, and, critically, segregated accounts holding donor-restricted funds for specific purposes such as priest retirement and seminarian education. The Diocese seeks

---

[1] The Diocese's address is 499 St. Matthews Street, El Paso, TX 79907. The last four digits of the Diocese's federal tax identification number are 0751.

authority to: (1) continue its pre-petition Cash Management System, including all existing bank accounts, business forms and merchant services and payment processing services; (2) waive certain federal depository requirements to avoid the significant cost and operational disruption of closing and opening dozens of accounts; and (3) ensure its banking partners continue to process transactions without interruption. Any disruption to this system would immediately and irreparably harm the Diocese's ability to pay its employees, fund its ministries, and maintain the segregation of trust funds, thereby jeopardizing the stability of its reorganization from the outset.

The Diocese seeks entry of an interim order substantially in the form attached hereto as Exhibit A (the "**Interim Order**"), and, after a final hearing, the entry of an order on a final basis in substantially the form attached hereto as Exhibit B (the "**Final Order**"). In support of this Motion, the Diocese relies on the *Declaration of Bishop Mark J. Seitz Regarding the Diocese's History, Charitable Mission, and Purpose in Seeking Chapter 11 Relief* (the "**Seitz Declaration**") and the *Declaration of Gregory J. Watters in Support of First Day Motions* (the "**Watters Declaration**," together with the Seitz Declaration, the "**First Day Declarations**"), which are incorporated by reference, and shows as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicates for the relief requested herein are sections 105, 363, 1107, and 1108 of Title 11 of the United States Code (the "**Bankruptcy Code**") and Federal Rules of Bankruptcy 6003 and 6004.

2

## BACKGROUND

4. On March 6, 2026 (the "**Petition Date**"), the Diocese filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Diocese continues to operate its business and manage its property as Diocese-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed, and no committees have been appointed or designated in this Chapter 11 case.

5. With the filing of the petition, Diocese filed the First Day Declarations. Please refer to the First Day Declarations for a summary of the Diocese in the above-referenced Chapter 11 case, including an overview of the Diocese's history, mission, ministries, financial position, the circumstances giving rise to the commencement of the Chapter 11 case, and an overview of the relief requested in the first day pleadings.

## THE DIOCESE'S EXISTING CASH MANAGEMENT SYSTEM

**A.      Overview of the Cash Management System.**

6. In the ordinary course of its religious and charitable operations, the Diocese maintains a comprehensive cash management system (the "**Cash Management System**") that enables it to efficiently collect receipts, make disbursements, and manage cash flow for its various ministries and operations. The Cash Management System has been developed over many years to comply with both civil law requirements and canonical obligations under the Code of Canon Law of the Roman Catholic Church.

7. The Cash Management System is essential to the Diocese's ability to maintain its religious mission, continue providing spiritual services to the faithful, operate educational institutions, and conduct charitable activities throughout the Diocese. Any disruption to this system would severely impair the Diocese's operations and harm the communities it serves.

**B. Bank Accounts and Financial Institutions.**

8. As of the Petition Date, the Diocese maintains approximately twelve (12) bank accounts (collectively, the "**Bank Accounts**") at the following financial institutions (collectively, the "**Banks**"):

    a. **WestStar Bank**

        i. Checking Account (Account No. ****2360)

        ii. Payroll Account (Account No. ****9122)

        iii. Health Insurance Account (Account No. ****3940)

        iv. Insurance Fund Money Market Account (Account No. ****5907)

        v. Money Market Account (Account No. ****5804)

        vi. Money Market Account (Account No. ****6985)

    b. **GECU Federal Credit Union**

        vii. Money Market Account (Account No. ****3850)

    c. **Wells Fargo Bank NA**

        viii. Checking Account (Account No. ****3257)

    d. **JPMorgan Chase Bank, N.A.**

        ix. Insurance Fund Checking Account (Account No. ****1756)

    e. **Charles Schwab**

        x. Money Market Account (Account No. ****6473)

    f. **Morgan Stanley**

        xi. Investment Account (Account No. ****3184)

        xii. Investment Account (Account No. ****8184).

    g.  **Mission Diocese Fund, LLC**

        xiii.  DOEP Insurance Fund Investment Account (Account No. ****1002)

**C.**  **Merchant Services and Payment Processing**

9.  The Diocese utilizes a credit card processing company, Elavon, Inc. ("**Elavon**"), to process credit card payments from tithing and other donations. Elavon automatically deducts any service charges before transferring settlements to the Diocese. The Diocese pays approximately $500 per month (which varies depending on the amount of credit card proceeds) to Elavon (the "**Processing Fees**"). As of the Petition Date, the Diocese estimates that there are no outstanding Processing Fees. The Diocese seeks authority to continue paying the Processing Fees and utilizing Elavon's payment processing services in the ordinary course on a post-petition basis consistent with historical practices to allow the continued collection of these funds.

**D.**  **Restricted and Special Purpose Accounts.**

10.  Critical to this Motion, the Diocese maintains eight (8) restricted fund accounts that are segregated from general operating funds and held for specific charitable and religious purposes pursuant to donor restrictions, canonical requirements, and fiduciary obligations. These restricted accounts include:

    a.  **WestStar Bank**

        i.  We are the Body of Christ Campaign Checking Account (Account No. ****7243)

        ii.  Sacred Heart Renovation Account (Account No. ****2478)

        iii.  We are the Body of Christ Campaign Money Market Account (Account No. ****5714)

        iv.  Lilly Endowment Investment Account (Account No. ****1864)

    b. **GECU Federal Credit Union**

        v. Diocese of El Paso Insurance Fund (Account No. ****7146)

    c. **Morgan Stanley**

        vi. Yetter Endowment Investment Account (Account No. ****2184)

    d. **JPMorgan Chase Bank, N.A.**

        vii. St. Joseph's Burse Trust (Account No. ****2007)

        viii. Robert and Mabel Lipscomb FD (Account No. ****7006)

11. The Diocese maintains meticulous records demonstrating the restricted nature of these funds, including donor correspondence, grant agreements, trust instruments, and canonical decrees. These restricted funds are not commingled with the Diocese's general operating accounts and are maintained in separately identified accounts with distinct accounting treatment.

    E. **Processing of Charitable Donations from Parishes**

In the ordinary course of the Diocese's business, it will receive donations that parishioners have made to their respective parishes and accumulated those funds for distribution to specific designated charities. In this role, the Diocese acts as a mere conduit of funds to the charities. The Diocese requests consent under Bankruptcy Code section 363(c) to continue this practice during the pendency of the bankruptcy case.

12. By this Motion, the Diocese seeks entry of the Interim Order:

    a. authorizing the Diocese to continue operating the Cash Management System in the ordinary course of business, including maintaining all existing Bank Accounts, banking relationships, and cash management practices;

    b. authorizing the Diocese to maintain and continue using all existing Bank Accounts, including all restricted fund accounts, special purpose accounts, and investment accounts, without interruption or modification;

    c. directing that the restricted fund accounts identified herein shall continue to be maintained in segregated accounts and shall not be commingled with any general operating accounts of the Diocese;

    d. waiving the requirements of section 345(b) of the Bankruptcy Code to the extent such requirements would be inconsistent with the Diocese's continued maintenance of its existing Bank Accounts and Cash Management System as to those banks not already part of the United States Trustee Depository Program[2];

    e. authorizing the Diocese to continue using its existing business forms, including but not limited to checks, deposit slips, invoices, and letterhead, for an interim period not to exceed 30 days from the Petition Date, provided that the Diocese shall immediately place an order for new checks and other business forms bearing the "Debtor in Possession" legend and the corresponding bankruptcy case number;

    f. authorizing the Banks to process, honor, and pay all checks or electronic fund transfers drawn on the Diocese's accounts to pay any obligations described herein, or for the Diocese to reissue approved payments that have been dishonored post-petition; and

    g. setting a final hearing (the "**Final Hearing**").

---

[2] The majority of the Diocese's bank accounts are with Westar Bank, which is an approved United States Trustee depository bank.

HB: 4936-5921-1919.4

## BASIS FOR RELIEF

**A.  The Business Judgment Standard Supports Continuation of the Cash Management System.**

13. Section 363(b)(1) of the Bankruptcy Code provides that a debtor may use property of the estate outside the ordinary course of business with court approval. The Fifth Circuit applies a deferential "business judgment" standard, requiring only "some articulated business justification" for the proposed action. *See In re Continental Airlines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986); *In re J.C. Penney Direct Marketing Services, L.L.C.*, 50 F.4th 532, 541 (5th Cir. 2022) (confirming standard applies with "substantial deference").

14. Continuation of the Cash Management System constitutes a sound exercise of the Diocese's business judgment for three independent reasons. First, the Cash Management System—including the maintenance of all existing Bank Accounts, banking relationships with the Banks, existing business forms, and the payment processing services provided by Elavon—is essential to the Diocese's daily religious, charitable, and educational operations, and any disruption thereto would cause immediate and irreparable harm to the Diocese, its estate, and the communities it serves. Second, requiring the Diocese to close its existing Bank Accounts, establish new debtor-in-possession accounts, and reconstruct its banking infrastructure would impose significant costs and administrative burdens on the estate without any corresponding benefit to creditors. Third, the continued maintenance of the Cash Management System preserves the segregation of restricted fund accounts, thereby protecting the property rights of third parties and ensuring the Diocese's compliance with its legal and fiduciary obligations, as discussed more fully below.

**B.  The Restricted Fund Accounts Must Remain Segregated to Protect Valid Trust Interests.**

15. Section 541(d) of the Bankruptcy Code excludes from the bankruptcy estate property in which the debtor holds only bare legal title, such as a trustee. Courts have held that funds held by religious organizations subject to express donor restrictions are not property of the estate available to general creditors. *See, e.g., In re Roman Catholic Archbishop of Portland*, 345 B.R. 686, 706-707 (Bankr. D. Or. 2006).

16. Under Texas law, the Diocese's obligation to maintain these restricted funds separately is not merely contractual but involves property rights of third parties. Texas has adopted the Uniform Prudent Management of Institutional Funds Act (UPMIFA), Tex. Prop. Code § 163.001 *et seq.*, which legally mandates that the Diocese honor donor restrictions, creating an enforceable legal obligation that separates these funds from the Diocese's general assets. Additionally, Texas law recognizes that a donor's right to dissolve a donation for failure to meet conditions is a substantial property right, not merely a personal claim. *El Dorado Land Co., L.P. v. City of McKinney,* 395 S.W.3d 798 (Tex. 2013) (finding such rights to be assignable).

17. This Court has recognized that Texas law determines property interests within bankruptcy proceedings. *See In re Sw. Fabricators, Inc.,* 40 B.R. 790, 791 (Bankr. W.D. Tex. 1984) ("State law is determinative on the issue of entitlement to property rights "). Further, this Court has held that "that the restricted funds held by the Debtor are not property of the estate." *In re Save Our Springs (S.O.S.) All., Inc.,* 388 B.R. 202, 247 (Bankr. W.D. Tex. 2008), *aff'd sub nom. In re Save Our Springs All., Inc.,* No. A-08-CA-727 LY, 2009 WL 8637183 (W.D. Tex. Sept. 29, 2009), *aff'd sub nom. In re Save Our Springs (S.O.S.) All., Inc.,* 632 F.3d 168 (5th Cir. 2011).

18. In *Save Our Springs*, the Court found that protecting donor restricted funds in bankruptcy was so vital that even though the Debtor had used the funds in an unauthorized manner,

that action "should not override the express intent of the donors, and should therefore not destroy the overall character of the funds as restricted." *Id.* at 249.

19. The principle from *Save Our Springs* applies even more forcefully here, where the Diocese has scrupulously complied with the terms of use for restricted funds. Just as the donor funds in *Save Our Springs* remained restricted despite being held by Save Our Springs, the Diocese's donor-restricted funds remain subject to the enforceable rights of donors who imposed the restrictions and the beneficiaries for whom the funds are designated. By maintaining meticulous segregation of these funds in separately identified accounts with distinct accounting treatment, the Diocese ensures it never exercises improper dominion over property belonging to others.

20. For these reasons, the Court should authorize the Diocese to continue maintaining these restricted funds in their segregated accounts, preserving both the property rights of third parties and the Diocese's ability to comply with its legal obligations under Texas law.

C. **This Court Should Waive the Requirements of § 345(b) to Authorize the Processing of Checks and Electronic Fund Transfers and Maintenance of Existing Accounts.**

21. Section 345 of the Bankruptcy Code governs the deposit and investment of estate funds, balancing two key objectives: (1) permitting a debtor to achieve the "maximum reasonable net return" on estate funds through deposits and investments, provided that (2) the funds are held safely to protect creditors' recovery. 3 Collier on Bankruptcy P 345.01 (16th 2024). While § 345(a) grants debtors' discretion to invest estate funds so "they [will] not lie idle for long periods of time" (*In re J & J Record Distributing Corp.*, 84 B.R. 364 (E.D. Penn. 1988)); § 345(b) restricts who may hold these funds, requiring that they be deposited in accounts that are fully insured or collateralized.

22. The Diocese acknowledges that the Operating Guidelines for the United States Trustee for Region 7 (the "**U.S. Trustee**") generally require a debtor to immediately close all prepetition bank accounts and open new debtor-in-possession accounts at an authorized depository. However, courts may waive this requirement for cause, particularly where compliance would be burdensome due to a debtor's "complex cash management system." *In re Serv. Merch. Co.*, 240 B.R. 894, 898 (Bankr. M.D. Tenn. 1999).

23. Congress explicitly authorized such waivers to avoid "needless[] handcuff[s]" on "larger, more sophisticated debtors" who hold substantial assets in complex investment vehicles and accounts. *In re Serv. Merch. Co.*, 240 B.R. 894, 896 (Bankr. M.D. Tenn. 1999) (citing HR Rep. 103-834, 103rd Cong., 2nd Sess. 224 (Oct. 4. 1994); 140 Cong. Rec. H10767 (Oct. 4. 1994)).

24. When determining cause under § 345(b), courts apply a totality of the circumstances test, considering factors such as the sophistication of the debtor's business, the complexity of the case, safeguards in place to protect estate funds, the benefit to the debtor, and the overall reasonableness of the request. 240 B.R. at 896; *see also In re King Mt. Tobacco Co.*, 623 B.R. 323, 333-34 (Bankr. E.D. Wash. 2020) (noting additional factors, including the burden to "dissemble[] and then rebuil[d] at other banking institutions").

25. Here, compelling cause exists for a waiver of § 345(b). First, 11 U.S.C. § 1108 authorizes the Diocese to continue its operations during bankruptcy, provided it adheres to applicable bankruptcy and non-bankruptcy law. Specifically, 28 U.S.C. § 959(b) mandates compliance with state law when administering investment accounts, triggering the standards set forth in the UPMIFA. While § 345(b) focuses narrowly on where the investment funds are held, Texas law establishes standards for administering, investing, and maintaining the funds, with both frameworks aiming to safeguard assets for beneficiaries or creditors. Granting a waiver here would

allow the Diocese to satisfy the fundamental purpose of § 345—protecting estate assets—while avoiding unnecessary and potentially harmful restrictions that could conflict with the Diocese's obligations under UPMIFA.

26. Second, as a nonprofit, the Diocese relies on investment returns to help fund its operations. This reliance supports a waiver of § 345(b) under the totality of the circumstances, as outlined in *Serv. Merch*. and *King Mt. Tobacco*. Given the Diocese's structure and absence of for-profit activities, its investment accounts are an essential component to ongoing operations and mission fulfillment, not mere profit generation. Although Congress amended § 345(b) to avoid unnecessarily restricting larger, sophisticated for-profit debtors (*see Serv. Merch.,* 240 B.R. at 896), the same rationale is applicable to sophisticated nonprofits like the Diocese, which face unique challenges in managing and safeguarding accounts during bankruptcy. Courts have recognized similar circumstances in other diocesan bankruptcies and granted waivers accordingly. *See In re Diocese of Alexandria*, Case No. 25-31257 (Bankr. W.D. La. Dec. 10, 2025) [Docket No. 169]; *The Roman Catholic Church of the Archdiocese of New Orleans*, Case No. 20-10846 (Bankr. E.D. La. May 1, 2020) [Docket No. 174]; *In re Diocese of Buffalo*, 621 B.R. 91 (Bankr. W.D. N.Y. 2020); *The Diocese of Rochester*, Case No. 19-20905 (Bankr. W.D. N.Y. Sept. 12, 2019) [Docket No. 368]; *The Roman Catholic Archbishop of San Francisco*, Case No. 23-30564 (Bankr. N.D. Ca. Aug. 21, 2023) [Docket No. 257].

27. Moreover, the Diocese's complex system of accounts is deeply integrated with automated payroll, electronic receipts, and automatic debits. The process of closing and reopening these accounts would cause massive operational disruption, incur substantial costs, and potentially violate donor agreements tied to specific accounts.

28. Similarly, requiring the Diocese to liquidate its diversified holdings in favor of Treasury securities would concentrate risk, potentially increasing the Diocese's exposure rather than enhancing protection.[3] The Diocese maintains diversified investments with reputable financial institutions, most of which are FDIC-insured and have strong credit profiles. Each institution provides specialized services aligned with the Diocese's operational needs.

29. WestStar Bank is a locally owned, FDIC-insured, private community bank headquartered in El Paso, Texas. WestStar Bank is a subsidiary of WestStar Bank Holding Company, Inc. ("**WBHC**"). Weststar Bank is an Authorized Depository, as is JPMorgan Chase and Wells Fargo.[4]

30. GECU Federal Credit Union ("**GECU**"), is a member-owned, not-for-profit credit union established over 90 years ago. GECU is federally insured by National Credit Union Administration ("**NCUA**") up to $250,000. GECU is one of the largest and strongest credit unions in Texas and New Mexico with more than 435,000 members, 28 state-of-the-art branches, innovative online services, and more than $4.4 billion in assets.[5]

31. These are only a few examples of the Diocese's relationships with highly regarded and sophisticated financial institutions, which ensure continuity of financial services even if one institution encounters difficulties. Without such diversification, the Diocese's assets would be

---

[3] For example, in March 2023, Silicon Valley Bank ("**SVB**") collapsed partially because of its excessive concentration in long-duration Treasury bonds and agency mortgage-backed securities. Bepi Pezzulli, *Surviving the Stampede: Market-Based Resolutions vis-à-vis Overregulation*, 64 Va. J. Int'l L. Online 1, 8 (2023). When the Federal Reserve raised rates, SVB faced billions of dollars in unrealized losses on its supposedly safe Treasury holdings, ultimately leading to the bank's closure. Xuan-Thao Nguyen, *Too Woke to Fail? ESG and Silicon Valley Bank's Demise*, 99 Wash. L. Rev. 1263, 1275 n.54 (2024*)*. In contrast to SVB's concentrated and vulnerable portfolio, the Diocese employs a diversified approach across multiple well-capitalized institutions, which provides enhanced stability and risk mitigation.
[4] *Authorized Depository List, USTP Region 7, USTP Authorized Depository Institution*.
[5] GECU Community & Culture (https://www.gecu.com/community-culture/values-and-structure/about-us)

HB: 4936-5921-1919.4

exposed to risks similar to those that led to the collapse of SVB. By maintaining a diversified portfolio across several reputable institutions, the Diocese significantly mitigates such risks.

32. According to FDIC records, there have only been fourteen bank failures in the United States since 2020.[6] In three of those failures, the FDIC made all depositors whole via the systemic risk exception. In ten of those failures the FDIC arranged for a healthy bank to acquire the failed institution and assume all of the uninsured deposits. One bank, the First National Bank of Lindsay, Oklahoma, the FDIC paid 50% to uninsured depositors up front and the balance to be paid to those depositors will depend on the sale of remaining assets.[7]

33. In this context, it is important to note that depositors prime general unsecured creditors in bank failures. *See* 12 U.S.C. § 1821(d)(11).

34. The likelihood of any one of the Diocese's banks to fail and cause the Diocese to lose uninsured deposits is extremely remote.

35. Finally, the Diocese's Banks are well-capitalized, FDIC and NCUA-insured institutions, and the Diocese will request these banks to immediately retitle all accounts to reflect the Diocese's chapter 11 status, and will apply the language "Debtor-in-Possession" and the case number to all checks issued after the filing and prior to confirmation, providing substantial protection for the estate's funds and complying with the spirit of the U.S. Trustee's guidelines.

36. For all these reasons, the Diocese has demonstrated ample cause for a waiver of § 345(b)'s requirements in this case.

---

[6] *Failed Bank List*, FDIC (https://www.fdic.gov/bank-failures/failed-bank-list?combine=&items_per_page=100&pg=1&order=field_date_only&sort=desc) (last visited Feb. 25, 2026).

[7] *Failed Bank Information for The First National Bank of Lindsay, Lindsay, OK*, FDIC (https://www.fdic.gov/bank-failures/failed-bank-list/first-national-bank-lindsay) (last visited Feb. 25, 2026); *see also* Aaron Klein, *Three cheers for normal bank failure*, The Brookings Institution (https://www.brookings.edu/articles/three-cheers-for-normal-bank-failure/) (last visited Feb. 25, 2026).

HB: 4936-5921-1919.4

**D.     Interim Relief Is Warranted to Avoid the Potential for Immediate and Irreparable Harm.**

37.     To avoid immediate and irreparable harm, a Court may grant the relief requested within 21 days after the Petition Date. *See* Fed. R. Bankr. P. 6003. The "immediate and irreparable harm" standard is satisfied where, as here, going forward without the relief requested could impair a debtor's ability to operate.

38.     Any interruption or lapse in the Cash Management System would prevent the Diocese from paying its employees, funding its ministries, and maintaining its charitable services, constituting precisely the "immediate and irreparable harm" contemplated by Rule 6003. Courts in this Circuit regularly grant such relief on an emergency basis. *See In re Stage Stores, Inc.*, Case No. 20-32564 (DRJ) (Bankr. S.D. Tex. May 11, 2020); *In re Fieldwood Energy LLC*, Case No. 20-33948 (DRJ) (Bankr. S.D. Tex. Aug. 4, 2020).

**E.     The Essential Nature of the Relief Requested Justifies the Waiver of Stay and Notice Requirements.**

39.     Given the essential nature of the relief requested, the Diocese respectfully requests a waiver of (a) the notice requirements of Bankruptcy Rule 6004(a), and (b) the 14-day stay under Bankruptcy Rules 6004(h), 7062, 9014, or otherwise. The critical nature of maintaining the cash management system and bank accounts and the potential for immediate harm support this request.

## NOTICE

40.     The Diocese will provide notice of this Cash Management Motion to: (i) the Office of the United States for Trustee for Region 7; (ii) the attorneys for the Committee once the committee has been appointed, and until then, (a) the Plaintiffs in abuse lawsuits against the Diocese through their counsel and (b) the Diocese's twenty (20) largest unsecured trade creditors; (iii) those persons who have formally appeared by filing a Notice of Appearance, a Request for

15

HB: 4936-5921-1919.4

Notice, or a similar document and requested notice in this case under Bankruptcy Rule 2002; (iv) the Texas Attorney General's Office; (v) the Diocese's banks and financial, including Weststar Bank through its counsel; (vi) the ad hoc group of abuse survivors through its counsel, Drew J. Glasnovich; and (vii) to the extent applicable, known counsel to the foregoing. A copy of this Motion and any orders approving it will also be made available on the Diocese's Case Information Website located at https://cases.stretto.com/dioceseofelpaso. The Diocese submits that, in light of the nature of the relief requested, no other or further notice need be given.

## RESERVATION OF RIGHTS

41. Nothing contained in this Motion is intended or should be construed as: (a) an admission as to the validity of any particular claim against Diocese; (b) a waiver of the Diocese's rights to dispute any particular claim on any grounds; (c) a promise to pay any particular claim; (d) the assumption of any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; or (e) a waiver or limitation of the Diocese's rights under the Bankruptcy Code or any other applicable law, including, without limitation, the 1983 Code of Canon Law for the Roman Catholic Church, the First Amendment of the United States Constitution, the Texas Constitution, the Religious Freedom Restoration Act, the church autonomy doctrine, any applicable charitable trust law, or the right to object to disclosure of information.

## NO PRIOR REQUEST

42. No prior motion for the relief requested has been made to this or any other court.

## CONCLUSION

**WHEREFORE**, the Diocese respectfully requests that the Court (a) enter an Interim Order substantially in the form attached as **Exhibit A** granting the relief requested herein, including

scheduling the Final Hearing; (b) enter a Final Order substantially in the form attached as **Exhibit B**; and (c) grant such other relief as the Court deems appropriate under the circumstances.

Dated: March 6, 2026

Respectfully submitted,

**HUSCH BLACKWELL LLP**

*/s/ Lynn Hamilton Butler*
Lynn Hamilton Butler (SBN 03527350)
Email: lynn.butler@huschblackwell.com
Tara T. LeDay (SBN 24106701)
Email: tara.leday@huschblackwell.com
Jennifer Pollan (SBN 24150828)
Email: jennifer.pollan@huschblackwell.com
111 Congress Avenue, Suite 1400
Austin, Texas 78701
Main No. (512) 472-5456
Fax No.  (512) 479-1101

-and-

**HUSCH BLACKWELL LLP**
Francis H. LoCoco, Esq. (TBN 24122830)
Email: frank.lococo@huschblackwell.com
511 North Broadway, Suite 1100
Milwaukee, WI 53202
Telephone   (414) 273-2100
Facsimile   (414) 223-5000

**PROPOSED ATTORNEYS FOR THE DEBTOR AND DEBTOR IN POSSESSION, CATHOLIC DIOCESE OF EL PASO**

HB: 4936-5921-1919.4

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 6, 2026, a true and correct copy of the forgoing document, together with all exhibits and attachments hereto, was filed with the Court and served via Certified Mail/Return Receipt Requested and United States first-class mail to the bank parties listed below and on the parties on the attached service via the method indicated.

WestStar Bank
c/o James Brewer
KEMP SMITH LAW
221 N. Kansas, Suite 1700
El Paso TX 79901

GECU Federal Credit Union
Corporate Office
P O Box 20998
El Paso TX 79998-0998

Wells Fargo Bank, N.A.
P O Box 6995
Portland OR 97228-6995

Charles Schwab & Co., Inc.
1945 Northwestern Drive
El Paso TX 79912-1108

JPMorgan Chase Bank, N.A.
P O Box 182051
Columbus Ohi 43218-2051

Morgan Stanley
7175 N. Pima Canyon Drive
Tucson AZ 85718

Mission Diocese Fund, LLC
150 South Wacker Drive, Suite 2000
Chicago IL 60606

                                                           */s/ Lynn Hamilton Butler*
                                                           Lynn Hamilton Butler

HB: 4936-5921-1919.4

**Secured Creditor**
WestStar Bank
c/o James Brewer
KEMP SMITH LAW
221 N. Kansas, Suite 1700
El Paso TX 79901
*Via Email: jim.brewer@kempsmith.com*

**Ad Hoc Committee**
c/o Drew J. Glasnovich
STINSON LLP
50 South Sixth Street, Suite 2600
Minneapolis MN 55402
*Via Email: drew.glasnovich@stinson.com*

**U.S. Trustee**
Aubrey Thomas
Assistant United States Trustee
UNITED STATES TRUSTEE-REGION 7
615 E. Houston Street, Suite 533
San Antonio TX 78205
*Via Fax: 210-472-4649*

**Texas Attorney General**
Texas Office of the Attorney General
Bankruptcy & Collections Division
P.O. Box 12548
Austin TX 78711-2548
*Via U.S. Mail*

**Top 20 Unsecured Creditors**

**GALLAGHER BASSETT SERVICES, INC.**
Attn: Steve Puteki
15763 Collections Center Drive
Chicago IL 60693
*Via Email: GB-AR-Mail@gbtpa.com*

**Gilberto Morales**
c/o David M. Driscoll
AINSA HUTSON LLP
5809 Acacia Circle
El Paso TX 79912-4859
*Via Email: info@ahhclawyers.com*

**Isaac Melendrez**
c/o Margie A. Rutledge
Carey Bhalla
Carolyn M. Nichols
Roshanna K. Toya
ROTHSTEIN DONATELLI LLP
500 4th Street, N.W., Suite 400
Albuquerque NM 87102
*Via Emal: mrutledge@rothsteinlaw.com*
*Via Email: cbhalla@rothsteinlaw.com*
*Via Email: cnichols@rothsteinlaw.com*
*Via Email: rtoya@rothsteinlaw.com*

**John Doe "203"; Jane Doe "204";**
**John Doe "206"; Jane Doe 208;**
**John Doe 209; John Doe 211;**
**John Doe 212; Jane Doe 214**
c/o Levi A. Monagle
Shayne C. Huffman
Jason T. Wallace
HUFFMAN WALLACE & MONAGLE LLC
122 Wellesley Dr. SE
Albuquerque NM 87106
*Via Email: office@hmhw.law*

-and-

c/o Ben Davis
Zackeree Kelin
Ellen Geske
DAVIS KELIN LAW FIRM, LLC
127 Bryn Mawr Drive, SE
Albuquerque NM 87106
*Via Email: bdavis@daviskelin.com*
*Via Email: zkelin@daviskelin.com*
*Via Email: egeske@daviskelin.com*

**Jane Doe 1; Jane Doe 2; Jane Doe 3;**
**Jane Doe 4; Jane Doe 5**
c/o Taylor E. Smith
Carolyn M. "Cammie" Nichols
ROTHSTEIN DONATELLI LLP
500 4th Street, N.W., Suite 400
Albuquerque NM 87102
*Via Email: tsmith@rothsteinlaw.com*
*Via Email: cmnichols@rothsteinlaw.com*

HB: 4936-5921-1919.4

*-and-*

c/o Sam Fadduol
Christopher P. Winters
FADDUOL, CLUFF, HARDY &
CONAWAY, P.C.
3301 San Mateo Boulevard NE
Albuquerque NM 87107
*Via Email: sfadduol@fchclaw.com*
*Via Email: cwinters@fchclaw.com*

-and-

c/o Paul Linnenburger
Lane + Linnenburger + Lane LLP
P O Box 6622
Albuquerque NM 87197
*Via Email: paul@attorneyslane.com*

**John Doe 1; John Doe 2;**
**Leigh Messerer as Personal**
**Representative of John Doe 3**
c/o Taylor E. Smith
Carolyn M. "Cammie" Nichols
Carey Bhalla
Roshanna K. Toya
ROTHSTEIN DONATELLI LLP
500 4th Street, N.W., Suite 400
Albuquerque NM 87102
*Via Email: tsmith@rothsteinlaw.com*
*Via Email: cmnichols@rothsteinlaw.com*
*Via Email:  cbhalla@rothsteinlaw.com*
*Via Email:  rtoya@rothsteinlaw.com*

**John Doe 210;**
c/o Levi A. Monagle
Shayne C. Huffman
Jason T. Wallace
HUFFMAN WALLACE & MONAGLE LLC
122 Wellesley Dr. SE
Albuquerque NM 87106
*Via Email: office@hmhw.law*

HB: 4936-5921-1919.4