## IN THE UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 26-30311-CGB** |
| **CATHOLIC DIOCESE OF EL PASO,** | § | |
| | § | **CHAPTER 11** |
| **DEBTOR[1]** | § | |

### AMENDED[2] DECLARATION OF GREGORY J. WATTERS
### REGARDING THE NEED FOR CHAPTER 11 RELIEF
### AND IN SUPPORT OF FIRST DAY MOTIONS

I, Gregory J. Watters, state under penalty of perjury that the following is true and correct:

1. I am the Chief Financial Officer of the Catholic Diocese of El Paso (the "**Diocese**"), a non-profit religious corporation incorporated under the laws of the State of Texas. I have served in this capacity since January 13, 2024. I have more than forty-four years of experience in accounting and finance.

2. In my role as Chief Financial Officer, I am responsible for overseeing all financial operations of the Diocese, including budgeting, financial reporting, cash management, insurance procurement, payroll administration, and vendor relationships. I directly supervise the Diocese's accounting staff and work closely with department heads to ensure proper financial controls and reporting.

3. I am familiar with the Diocese's day-to-day operations, including its cash management system, insurance programs, utility services, employee compensation and benefits, and relationships with vendors and service providers. I maintain regular contact with our financial institutions, insurance brokers, utility providers, and oversee payroll processes.

---

[1] The Diocese's address is 499 St. Matthews Street, El Paso, TX 79907. The last four digits of the Diocese's federal tax identification number are 0751.

[2] This Declaration is being amended to correct the accounting figures in paragraphs 10 and 37.

HB: 4922-2981-5445.3

**EXHIBIT 2**
**Page 1 of 22**

4.      I respectfully submit this Declaration based on my personal knowledge of the Diocese's financial and operational affairs; information learned from my review of relevant documents, including financial statements, insurance policies, payroll records, and utility bills; and information provided to me by members of my staff and the Diocese's advisory team. I am authorized to submit this Declaration on behalf of the Diocese, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

5.      I personally reviewed the factual exhibits attached to the Diocese's First Day Motions, including:

    a.  **From the Cash Management Motion:**

- While no separate exhibits were attached, I confirm that all bank accounts, banking relationships, and cash management practices described therein are accurate based on my regular review of the account statements, accounting records, and donor agreements, as well as my oversight and implementation of cash management procedures.

    b.  **From the Insurance Motion:**

- **Exhibit C**: While no schedule of coverage was attached, the Insurance Motion accurately describes the policy types, coverage periods and carriers.

    c.  **From the Utilities Motion:**

- **Exhibit B** (List of Utility Companies): The utility providers, average monthly amounts, and account balances are accurate as of the Petition Date.

    d.  **From the Wage Motion:**

- While no separate exhibits were attached, I confirm that all employee counts, compensation amounts, and benefit costs stated in the motion are accurate based on our payroll records and benefits invoices, which I review monthly.

    e.  **From the Cash Collateral Motion**

- **Exhibit A-1 (Budget):** I have reviewed the budget and I confirm that the projected expenses are accurate.

2

**EXHIBIT 2**
**Page 2 of 22**

## PART I: PRELIMINARY STATEMENT

6.      I submit this Declaration in support of the Diocese's First Day Motions, which seek authority to maintain critical operations during the Chapter 11 reorganization. Specifically, I address (a) the Diocese's financial condition and the circumstances necessitating this Chapter 11 filing; and (b) the factual bases for the Diocese's requests to continue its critical cash management system, its comprehensive Insurance Program, maintain uninterrupted utility services, and pay employee wages and benefits.

7.      The relief requested in these motions is essential to preserve the Diocese's ability to serve over 650,000 Catholics across its 26,686-square-mile territory in far West Texas. Any disruption in the cash-management system, insurance coverage, utility services, or employee compensation would immediately impair the Diocese's ability to maintain its 58 parishes, 14 mission churches, schools and charitable ministries that provide critical support to communities throughout this vast border region.

8.      Part II of this Declaration provides an overview of the Diocese's financial condition and the necessity for Chapter 11 relief. Part III describes the Diocese's existing cash management system. Part IV outlines the Diocese's insurance program. Part V addresses utility services, while Part VI discusses employee compensation and benefits. Part VII details the Diocese's need to utilize cash collateral, Part VIII details the Diocese's immediate and ongoing operational needs, and Part IX explains the potential consequences of any operational disruption if the relief requested in the First Day Motions is not granted.

EXHIBIT 2
Page 3 of 22

## PART II: THE DIOCESE'S FINANCIAL CONDITION AND NECESSITY OF CHAPTER 11 RELIEF

**A. Overview of Financial Position.**

9.     As Chief Financial Officer, I oversee the Diocese's financial conditions and am intimately familiar with our revenue sources, operating expenses, and cash flow challenges. The Diocese operates as a "Mission Diocese," with pastoral responsibilities shaped by a large geographic territory and a widely dispersed Catholic population of approximately 686,000 across 26,686 square miles in far West Texas.

10.     For years, the Diocese's operating expenses have exceeded its gross revenue. Preliminary figures for the fiscal year ending June 30, 2025, reflect revenue of approximately $14,962,522, and expenses of approximately $15,364,240, for a net loss of $(401,718). Previously, in FY 2023-2024 and FY 2022-2023 and the Diocese had Net income (losses) of approximately $1,642,761 and $(386,621) respectively.

11.     Our primary revenue sources include diocesan collections, parish assessments, fees for programs and services, investment income, and limited grant funding. As a Mission Diocese, we receive assistance ranging from $2,500,000 to $4,500,000 annually for certain eligible activities, but this support is insufficient to address our structural deficit or the unprecedented legal costs we now face.

**B. Impact of Clergy Sexual Abuse Litigation.**

12.     The Diocese's already precarious financial position is now severely exacerbated by litigation and claims related to decades-old clergy sexual abuse. These cases represent our most significant financial threat and the primary driver for our decision to seek Chapter 11 protection.

13.     Based on prior settlements of claims related to decades-old clergy sexual abuse, the Diocese does not have the resources to resolve each case in a similar fashion. With 12 pending

HB: 4922-2981-5445.3

**EXHIBIT 2**
**Page 4 of 22**

cases, the legal defense and potential judgments or settlements would greatly hurt the Diocese's financial position.

14.     Indications from local plaintiffs' attorneys and the experiences of other dioceses suggest that additional persons may assert claims before the statute of limitations expires. Should the number of claims increase as anticipated, the Diocese's legal expenses alone could result in a total financial collapse of the Diocese.

15.     An insurance archivist retained by the Diocese searched for historical liability insurance policies, but the policy periods identified to date do not encompass all dates of alleged abuse. Even where coverage may exist, policy limits and potential coverage disputes create significant uncertainty regarding available insurance proceeds.

16.     Without the protections of Chapter 11, adverse judgments in even a small number of the pending lawsuits could exhaust our available assets, forcing immediate cessation of operations and leaving later claimants without any possibility of compensation.

**C. Restricted Funds and Asset Limitations.**

17.     Of the Diocese's total assets, approximately 25% of the assets are restricted by donors for designated purposes and are not available to satisfy general creditor claims.

18.     As Chief Financial Officer, I oversee the Diocese's compliance with donor restrictions and Texas's requirements for institutional funds. The Diocese maintains detailed procedures for tracking and managing donor-restricted funds separately from unrestricted assets. I personally review these procedures quarterly and work with our legal counsel and seek advice to comply with Texas law.

19.     In my role, I maintain separate accounting records for all donor-restricted funds. These records document the specific purposes for which funds were donated, track expenditures

HB: 4922-2981-5445.3

**EXHIBIT 2**
**Page 5 of 22**

to ensure compliance with donor intent, and provide regular reporting to our board oversight committee. The Diocese's restricted funds are held in separate investment accounts and bank accounts that I monitor monthly. Our board requires quarterly reporting on all restricted fund activity, and I personally certify compliance with donor restrictions as part of our annual audit process.

20.     Our restricted assets fall into several categories that I monitor regularly: seminarians, religious formations, rural parishes, diaconate, charitable funds restricted to particular ministries, and other donations subject to donor-imposed limitations.

21.     The Diocese maintains separate accounting for restricted funds and uses such funds only in accordance with donor restrictions. The Diocese acts as custodian of these donor-restricted funds, and as such, has no claim to the restricted funds.

22.     The substantial portion of our assets being restricted significantly limits our ability to address the mounting litigation costs and potential judgments described above. The distinction between restricted and unrestricted assets significantly affects the resources actually available for creditor distribution and any reorganization plan, making bankruptcy reorganization our only viable option to preserve both restricted and unrestricted assets for their intended purposes while ensuring equitable treatment of all creditors.

23.     From my experience managing the Diocese's finances, maintaining donor confidence is crucial to our continued mission. Donors expect their restrictions to be honored absolutely, and any failure to respect donor intent would severely damage our reputation and ability to attract future charitable contributions. This would create a devastating long-term financial impact that would undermine our capacity to serve the Catholic community, even after emerging from this Chapter 11 case.

HB: 4922-2981-5445.3

EXHIBIT 2
Page 6 of 22

24.     More broadly, approximately 48% of the Diocese's total "assets" are functionally restricted. We assess a 13.5% "fee" of a parish's income from most parishes (cathedraticum). 2.5% of that is used for priest retirement. The health insurance for retired priests is also paid out of the priest retirement fund in the amount of $3,602 per month.

**D.  Necessity of Bankruptcy.**

25.     Prior to filing this Chapter 11 case, I worked with diocesan leadership to explore all available alternatives to bankruptcy. However, the magnitude of potential liability far exceeds our available resources. The Diocese's unrestricted assets are insufficient to satisfy potential judgments that could reach tens of millions of dollars based on settlements in other dioceses facing similar litigation.

26.     The Chapter 11 process provides the only viable mechanism to: (a) ensure equitable treatment of all abuse survivors; (b) maximize available resources for survivor compensation through an orderly reorganization; (c) preserve essential ministries and charitable works; and (d) provide certainty for our employees, parishes, and the communities we serve.

27.     Without Chapter 11 protection, the Diocese faces the very real prospect of piecemeal litigation that would likely result in early claimants receiving substantial recoveries while later claimants receive nothing. This outcome serves neither the interests of justice nor the abuse survivors who deserve fair compensation for the harm they suffered.

## PART III: THE DIOCESE'S EXISTING CASH MANAGEMENT SYSTEM

**Overview of the Cash Management System.**

28.     In the ordinary course of its religious and charitable operations, the Diocese maintains a comprehensive cash management system (the "**Cash Management System**") that enables it to efficiently collect receipts, make disbursements, and manage cash flow for its various

7

EXHIBIT 2
Page 7 of 22

ministries and operations. The Cash Management System has been developed over many years to comply with both civil law requirements and canonical obligations under the Code of Canon Law of the Roman Catholic Church.

29.     The Cash Management System is essential to the Diocese's ability to maintain its religious mission, continue providing spiritual services to the faithful, operate educational institutions, and conduct charitable activities throughout the Diocese. Any disruption to this system would severely impair the Diocese's operations and harm the communities it serves.

**B.     Bank Accounts and Financial Institutions.**

30.     As of the Petition Date, the Diocese maintains approximately thirteen (13) bank accounts (collectively, the "**Bank Accounts**") at the following financial institutions (collectively, the "**Banks**"):

    a.  **WestStar Bank**

        i.     Checking Account (Account No. ****2360)

        ii.    Payroll Account (Account No. ****9122)

        iii.   Health Insurance Account (Account No. ****3940)

        iv.    Insurance Fund Money Market Account (Account No. ****5907)

        v.     Money Market Account (Account No. ****5804)

        vi.    Money Market Account (Account No. ****6985)

    b.  **GECU Federal Credit Union**

        vii.   Money Market Account (Account No. **\*\*\*\*3850**)

    c.  **Wells Fargo Bank NA**

        viii.  Checking Account (Account No. ****3257)

    d.  **JPMorgan Chase Bank, N.A.**

8

**EXHIBIT 2**
**Page 8 of 22**

       ix.    Insurance Fund Checking Account (Account No. ****1756)

   **e. Charles Schwab**

       x.    Money Market Account (Account No. ****6473)

   **f. Morgan Stanley**

       xi.   Investment Account (Account No. ****3184)

       xii.  Investment Account (Account No. ****8184).

   **g. Mission Diocese Fund, LLC**

       xiii.  DOEP Insurance Fund Investment Account (Account No. ****1002)

**C.     Merchant Services and Payment Processing**

31.     The Diocese utilizes a credit card processing company, Elavon, Inc. (**"Elavon"**), to process credit card payments from tithing and other donations. Elavon automatically deducts any service charges before transferring settlements to the Diocese. The Diocese pays approximately $500 per month (which varies depending on the amount of credit card proceeds) to Elavon (the **"Processing Fees"**). As of the Petition Date, the Diocese estimates that there are no outstanding Processing Fees. The Diocese seeks authority to continue paying the Processing Fees and utilizing Elavon's payment processing services in the ordinary course on a post-petition basis consistent with historical practices to allow the continued collection of these funds.

   **D.     Restricted and Special Purpose Accounts.**

32.     The Diocese maintains eight (8) restricted fund accounts that are segregated from general operating funds and held for specific charitable and religious purposes pursuant to donor restrictions, canonical requirements, and fiduciary obligations. These restricted accounts include:

   **a. WestStar Bank**

HB: 4922-2981-5445.3

**EXHIBIT 2
Page 9 of 22**

i.   We are the Body of Christ Campaign Checking Account (Account No. ****7243)

ii.   Sacred Heart Renovation Account (Account No. ****2478)

iii.   We are the Body of Christ Campaign Money Market Account (Account No. ****5714)

iv.   Lilly Endowment Investment Account (Account No. ****1864)

**b. GECU Federal Credit Union**

v.   Diocese of El Paso Insurance Fund (Account No. ****7146)

**c. Morgan Stanley**

vi.   Yetter Endowment Investment Account (Account No. ****2184)

**d. JPMorgan Chase Bank, N.A.**

vii.   St. Joseph's Burse Trust (Account No. ****2007)

viii.   Robert and Mabel Lipscomb FD (Account No. ****7006)

33.   The Diocese maintains meticulous records demonstrating the restricted nature of these funds, including donor correspondence, grant agreements, trust instruments, and canonical decrees. These restricted funds are not commingled with the Diocese's general operating accounts and are maintained in separately identified accounts with distinct accounting treatment.

**E.      Processing of Charitable Donations from Parishes**

34.   In the ordinary course of the Diocese's business, it will receive donations that parishioners have made to their respective parishes and accumulated those funds for distribution to specific designated charities. In this role, the Diocese acts as a mere conduit of funds to the charities.

## PART IV: THE DIOCESE'S INSURANCE PROGRAM

**A. Overview and Structure.**

HB: 4922-2981-5445.3

10

EXHIBIT 2
Page 10 of 22

35.     The Diocese maintains a comprehensive Insurance Program that provides essential coverage for both its own operations and numerous separately-incorporated Catholic Institutions in Texas. This centralized approach, which I helped develop and refine over the past 12 years, achieves significant economies of scale that would be unavailable if parishes and schools purchased coverage independently.

36.     The Insurance Program protects not only the Diocese's Centralized Activities but also 58 parishes, 7 schools, and Catholic organizations.

37.     The total annual cost of the Insurance Program (not including Health Insurance Benefits) is approximately $1,482,361. The Diocese directly pays approximately $1,482,361 annually, of which approximately $1,456,386 is reimbursed by the parishes, schools, and other catholic insured entities under the Insurance Program, resulting in a net annual cost to the Diocese of approximately $25,975.

38.     The Diocese procures all insurance policies through its insurance broker.

**B.  Workers' Compensation Coverage.**

39.     The workers' compensation program operates through one layer of coverage. The policy provides coverage for the vast majority of routine workplace injuries.

40.     Our annual premium is $138,727 annually and paid by the Diocese in monthly installments of $10,782.44. The Diocese's portion for its direct employees is approximately $6,077 annually, with the remaining $132,650 reimbursed by the parishes, schools, and other ministries within the territorial limits of the Diocese. The next installment is scheduled for payment at the beginning of April 2026.

**C.  Property and Liability Insurance.**

11

EXHIBIT 2
Page 11 of 22

41. We maintain comprehensive property and liability coverage with Catholic Mutual Group as the primary carrier. This coverage protects:

    a. historic church buildings, many dating to the 19th century;

    b. school facilities educating 1,908 students;

    c. administrative buildings and residential properties; and

    d. general liability for religious, educational, and charitable activities.

42. The annual property and liability premium is approximately $1,262,141. Under our billing structure implemented this year, parishes, schools, and other ministries within the territorial limits of the Diocese are billed directly for their portion (approximately $1,260,639), while the Diocese pays approximately $1,502 for its Centralized Activities.

43. Coverage periods run from July 1, 2025 to June 30, 2026, with cyber coverage effective July 1, 2025.

44. In my role overseeing insurance matters, I reviewed all deductible and self-insured retention provisions in our current policies. These obligations are structured as follows:

    a. **Property Insurance Deductibles:**

        a. All Other Perils: $50,000 per occurrence per location with aggregate of $250,000

        b. Flood: $50,000 per occurrence per location with aggregate of $250,000 (except $250,000 per occurrence for locations outside NFIP coverage)

        c. Earthquake: $50,000 per occurrence

        d. Windstorm/Hail: $50,000 per occurrence per location with aggregate of $250,000

    b. **Liability Insurance SIRs:**

        a. $50,000 per occurrence/claim for most liability coverages.

        b. $250,000 annual aggregate for all liability coverages combined.

**D. Automobile Insurance.**

12

EXHIBIT 2
Page 12 of 22

45.     The automobile insurance is brokered by Catholic Mutual to Church Mutual Insurance. The total premium is $78,097 of which approximately $15,000 is paid by the Diocese. Coverages include liability of $500,000, collision and uninsured motorists. The Diocese auto policy with Church Mutual provides comprehensive coverage for physical damage and liability for autos owned by the Diocese of El Paso and its separately incorporated entities.

46.     Liability coverage includes a combined single limit of $500,000 and includes autos you own, hire, borrow, and non-owned autos such as employee vehicles used for business. The Diocese has coverage for no fault personal injuries and for uninsured motorists for any auto you own. The physical damage coverage extends to rental vehicles and any vehicle you own unless it is listed as Liability Only. See policy for full vehicle list. The Diocese also has towing and labor reimbursement for your private passenger autos. So this would exclude buses, heavy trucks, or other commercial vehicles.

47.     To the best of its knowledge and belief, the Diocese will satisfy its property, liability, and automobile insurance premium obligations for policy year 2025-2026, and does not anticipate incurring additional premiums for these coverages in this policy year.

**E.  Insurance Brokerage Services.**

48.     Catholic Mutual Group was established as The Catholic Mutual Relief Society of America in 1889 by a group of Midwest Catholic Bishops who were unable to obtain reasonably priced, reliable coverage for their church properties.

49.     Over the years, at the request of our members, the program was expanded to include liability, employee benefits, and excess liability pools.

13

HB: 4922-2981-5445.3

EXHIBIT 2
Page 13 of 22

50.     From these humble beginnings, Catholic Mutual Group has grown to be the largest provider of property/casualty coverage and related services to Catholic Dioceses, Religious Orders, and other Catholic Institutions, in North America.

### PART V: UTILITY SERVICES

51.     The Diocese requires continuous utility services to maintain its operations across multiple facilities. These services include electricity, landline telephones, cable, internet, and water services. I personally review and approve all utility bills monthly and maintain relationships with our primary providers.

52.     The Diocese directly pays for utilities at the Bishop's residence, two apartments, the seminary, and religious education and formation offices. Our primary utility providers include:

    a.  **Electricity**: El Paso Electric

    b.  **Gas**: Texas Gas Service

    c.  **Communications and Internet**: Spectrum

    d.  **Water/Sewer**: El Paso Water

53.     I personally reviewed and verified the utility provider list attached as Exhibit B to the Utilities Motion. This list was compiled from our accounts payable vendor master files and recent utility bills and statements.

54.     As of the Petition Date, the Diocese is current with all Utility Companies, except for (a) unbilled utility services, (b) billed utility services for which payment is not yet due, or (c) written checks not yet cleared (collectively, the "**Gap Period Obligations**"). These Gap Period Obligations arise from normal billing cycles and payment processing times, not from any inability or unwillingness to pay. I personally confirmed this payment status through my review of the Diocese's accounts payable records, utility account statements, and check registers.

14

HB: 4922-2981-5445.3

**EXHIBIT 2**
**Page 14 of 22**

55.    For each utility provider listed in Exhibit B, I confirmed the accuracy of vendor names, average monthly payment amounts, account balances as of the Petition Date, and that all accounts are current except for normal billing cycle timing. The current balance amounts reflected in Exhibit B represent the Diocese's best information as of the Petition Date based on our accounting records and recent account statements. Some utility providers may not have provided updated invoices or account balance confirmations as of the date of this Declaration, but I verified our payment history demonstrates consistent, timely payments to all utility providers.

56.    Based on my review of the past twelve months of utility bills, our average annual utility costs across all activities total approximately $21,886.08 broken down as follows:

        a.  El Paso Electric (electricity): $4,200

        b.  Texas Gas Service (gas): $4,500

        c.  El Paso Water (water): $5,520

        d.  Spectrum (communication & internet): $7,666.08

57.    These amounts vary seasonally, with higher electricity costs during summer months due to air conditioning needs and higher gas costs during winter months for heating.

58.    Any interruption in utility services would result in immediate and severe consequences. Specifically, utility disconnection would:

        a.  prevent the Diocese from providing essential administrative support to the network of Catholic institutions serving thousands of Texas residents;

        b.  impair the Diocese's ability to communicate with parishes, schools, and charitable organizations across our 26,686 square mile territory;

        c.  create unsafe conditions at diocesan properties, including compromising climate control in historic buildings and disrupting security systems;

        d.  force the shutdown of diocesan formation facilities, eliminating spiritual programs, educational workshops, and ministry training essential to the Diocese's mission;

        e.  eliminate critical communication infrastructure with our remote parishes; and

HB: 4922-2981-5445.3

**EXHIBIT 2**
**Page 15 of 22**

     f.   ultimately jeopardize the Diocese's reorganization efforts and harm creditor recoveries.

59.    Given our vast and predominantly rural service area, many locations offer limited access to utility providers. Disruption and subsequent reconnection could take time.

## PART VI: EMPLOYEE COMPENSATION AND BENEFITS

**A. Workforce Overview.**

60.    I oversee payroll and benefits administration for all Diocese employees. Our workforce is essential to maintaining religious, educational, and charitable services across El Paso. The Diocese employs 47 Laypersons (31 full-time, 16 part time) and 4 Diocesan Priests (including the Bishops). Additionally, the Diocese provides regular support payment for: 1 independent contractor providing mandated survivor assistance services (approximately $1,100 monthly); and 11 Seminarians in formation ($125 monthly stipend each).

61.    Our total monthly compensation obligation is approximately 148,725, comprised of: Laypersons at $72,000 per biweekly pay period (approximately $140,250 monthly); Diocesan Priests and deacons at $6,000 monthly; Independent Contractor at approximately $1,100 monthly; and Seminarian Stipends at $1,375 monthly. I personally verified all these amounts by reviewing payroll registers, employee reports, benefits records, and payment schedules.

62.    Our payroll records confirm these compensation and benefit programs remained consistently maintained for years with only routine or cost-of-living adjustments or merit increases. For example, the Diocese made bi-weekly 403(b) contributions for the benefit of eligible employees of $34,003 the last year. The Diocese provided the bi-weekly and monthly payments in compensation or other support for multiple years, and in some instances, for decades. These patterns represent our standard business practices and are consistent with practices throughout Catholic dioceses nationally.

16

EXHIBIT 2
Page 16 of 22

**B. Payroll Processing.**

63.    Laypersons are paid biweekly via direct deposit. I personally review and approve each payroll before processing. No individual Layperson receives more than $4,497 in salary or wages per pay period.

64.    Diocesan Priests and all monthly payments are processed on the last business day of each month. I maintain a monthly payment calendar to ensure timely processing of all compensation.

65.    As of the Petition Date, no pre-petition wages or salaries are outstanding.

**C. Employee Benefits.**

66.    The Diocese provides comprehensive benefits through the Reta Trust (Blue Cross Blue Shield for health insurance, Delta Dental for dental insurance, life insurance and disability through UNUM, and vision insurance through VSP Vision) including health, vision, dental, prescription, disability, and life insurance. The Diocese pays a portion of the employees' premiums at a monthly cost of approximately $42,250. The amount is contingent on the number of employees in the plan and the insurance they choose. These premiums are billed and due on the first of each month. Payments are made at the beginning of the month.

67.    For retirement benefits, eligible Laypersons participate in the Catholic Diocese of EL Paso 403(b) Plan of El Paso.  Employees are vested in the plan immediately for the Employees of the Diocese. The Diocese matches 1-3% of the employees' contribution. Our 2025 contribution totaled $34,003.

68.    Laypersons accrue annual paid time off (PTO)based on tenure, which is paid out upon separation. As of the Petition Date, I calculated our annual PTO liability based on each employee's accrued hours and current pay rate. No individual employee earned more than $11,690

HB: 4922-2981-5445.3

**EXHIBIT 2**
**Page 17 of 22**

in accumulated paid time off during the 180 days before the Petition Date. Moreover, no individual employee receives more than $4,497 in salary or wages per pay period, and the Diocese is in ordinary arrears as of the Petition Date, such that the combination of unpaid wages and accrued annual leave for each employee is well below the $17,150 priority cap.

**D. Critical Personnel.**

69.     **Several positions are particularly critical to our operations:**

a.      **Susan Martinez, Victim Assistance Coordinator**: As an independent contractor, Susan provides mandated services under the USCCB Charter for the Protection of Children and Young People. Her duties include supporting abuse survivors, conducting psychological evaluations for clergy candidates, and providing expert testimony in tribunal proceedings. Her specialized expertise would be extremely difficult to replace.

b.      **Financial Staff:** Our accounting team of 8 employees maintains all financial records, process accounts payable/receivable, and ensures compliance with nonprofit regulations. Any disruption would impair our ability to account for funds and maintain donor confidence.

c.      **School Oversight Personnel:** One employee coordinates educational programs for the schools located in the Diocese's territorial limits. The employees' departure would jeopardize our ability to maintain academic standards and regulatory compliance.

**E. Employee Morale and Retention.**

70.     The anticipation of the bankruptcy filing created significant anxiety among our workforce. Many employees approached me with concerns about job security and benefit

18

HB: 4922-2981-5445.3

EXHIBIT 2
Page 18 of 22

continuation. Several key employees indicated they would be forced to seek other employment if paychecks or health insurance were interrupted, even briefly.

71.     Given the modest compensation levels typical of religious organizations, our employees possess limited financial reserves. Any interruption in wages or benefits would cause immediate hardship and likely result in departures that would cripple our operations.

## PART VII: NEED TO UTILIZE CASH COLLATERAL

72.     .Prior to the Petition Date, on or around November 4, 2025, the Diocese became indebted to WestStar pursuant to a term loan (the "**Loan**") evidenced by a Promissory Note dated November 4, 2025.  To secure the loan, WestStar holds a valid and perfected lien on the following account including proceeds, increases, substitutions, and benefits (collectively, the "**Collateral**"):

- Money Market account number ending in 6985 established by Debtor with WestStar (the "**Pledged Account**") including all funds, monies and other assets in the Pledged Account, and
- All interest, increases, substitutions, replacements, additions, or dividends derived from the Pledged Account and its funds and assets.

73.     The Diocese believes that, in its business judgment, the ability to use interest payments from the Pledged Account both to service accruing interest on its secured debt and, as needed but only to the extent other funds or sources of cash are not available, to fund essential operations, is critical to preserving the value of the estate and maximizing the likelihood of a successful reorganization.

## PART VIII: IMMEDIATE OPERATIONAL NEEDS

74.     Based on my review of our financial records and payment schedules, the Diocese faces the following immediate payment obligations:

   a.  **Cash Management:** Ongoing obligations to maintain accounts, banking

       relationships, and cash management practices to ensure operational needs are met

       and donor restrictions are observed.

19

**EXHIBIT 2**
**Page 19 of 22**

b.  **Insurance:** Workers' compensation monthly installment payment of $10,352.49 scheduled for the beginning of April 2026.

**Payroll:** Next biweekly payroll of approximately $72,000 due on/about March 20, 2026.

**Utilities:** Ongoing monthly obligations of approximately $1,823.84 with various due dates.

75.  Without Court authorization, our banks may freeze accounts or refuse to process payments, causing immediate operational disruption.

<u>**PART IX: CONSEQUENCES OF OPERATIONAL DISRUPTION**</u>

76.  Any interruption in cash management, insurance, utilities, or payroll would create cascading effects:

a.  **Cash Management Interruption:** Would prevent the Diocese from paying its employees, funding its ministries, and maintaining its charitable services.

b.  **Insurance Lapse:** Would violate our statutory obligations, potentially trigger default provisions in contracts, and constitute "cause" for case conversion or dismissal under Bankruptcy Code Section 1112(b)(4)(C).

c.  **Utility Disconnection:** Would force immediate closure of facilities, prevent payroll processing and financial reporting, eliminate communication with remote parishes.

d.  **Payroll Interruption:** Would likely trigger immediate resignations of key personnel, violate our moral obligations to employees who already performed services, eliminate health insurance coverage for employees and families, and severely damage our ability to recruit replacement staff.

HB: 4922-2981-5445.3

**EXHIBIT 2**
**Page 20 of 22**

77.     The integrated nature of our operations means that failure in any one area would compromise the others. For example, utility disconnection would prevent payroll processing, while loss of key financial staff would impair our ability to maintain insurance and pay utilities.

78.     Most critically, these operational disruptions would immediately impact the vulnerable populations we serve. Schools might be forced to close and charitable programs would cease operations. For many in our rural service area, these Catholic institutions are essential resources.

## PART X: CONCLUSION

79.     Throughout my 12 years as CFO, I worked diligently to maintain the Diocese's operations despite ongoing financial challenges. The Cash Management System, Insurance Program, utility services, and employee compensation structures described herein represent the absolute minimum necessary to fulfill our religious and charitable mission. Any disruption in cash management, insurance, utilities, or payroll would cascade through our entire network of churches, schools, and charitable organizations, ultimately harming the very communities we exist to serve. The amounts involved—approximately $532,974.57 annually for insurance, $1,850 monthly for utilities, and $148,725 monthly for personnel, these costs which do not include the costs incurred monthly to run our ministries and offices—are modest relative to the scope of our operations and the critical services we provide throughout El Paso and surrounding areas.

80.     I personally reviewed all factual exhibits attached to the First Day Motions and confirm their accuracy based on my review of source documents and records maintained in the ordinary course of the Diocese's business.

HB: 4922-2981-5445.3

EXHIBIT 2
Page 21 of 22

81.     I respectfully urge the Court to grant the relief requested to ensure uninterrupted service to over 650,000 Catholics and countless others who depend on the Diocese's ministries, schools, and charitable programs.

I declare, pursuant to 26 U.S.C. § 1746, under penalty of perjury, that the foregoing is true and correct to the best of my information, knowledge, and belief.

Dated: MArch 9, 2026
El Paso, Texas

Gregory J. Watters
**Chief Financial Officer**
**Catholic Diocese of El Paso**

HB: 4922-2981-5445.3

**EXHIBIT 2**
**Page 22 of 22**